UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

   v.            Crim. No. 21-cr-156-JL
                 Opinion No. 2022 DNH 080

<u>Steven Potter</u>

## <u>**MEMORANDUM ORDER**</u>

  In advance of his trial on one count of possession with intent to distribute a controlled substance, <u>see</u> 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), defendant Steven Potter filed a motion to suppress evidence.[1]  The motion turns on whether a police officer's stop of the vehicle in which Potter was a passenger was constitutionally valid, such that the resulting seizure of controlled substances from Potter's bag and his inculpatory statements can stand.  The officer stopped the vehicle because the driver failed to signal before the roadway merged--reducing from two lanes to one, wide lane that gradually narrowed.  Potter asserts that the signaling statute did not require the driver to signal, so the officer conducted a traffic stop without probable cause to believe that a traffic violation occurred or reasonable suspicion of criminal activity, in violation of the Fourth Amendment.  The government contends that the statute is ambiguous as to whether a signal was required under these circumstances, but the officer's actions were nevertheless objectively reasonable and therefore lawful.

  After conducting an evidentiary hearing, viewing the roadway, and reviewing additional briefing at the court's invitation,[2] the court grants the motion.  The court finds that the plain language of the purportedly applicable statute is unambiguous and did not require the driver to

---

[1] <u>See</u> Doc. No. 14.

[2] <u>See</u> Government's Supplemental Brief (doc. no. 32); Def.'s Supplemental Brief (doc. no. 33).

signal under these circumstances. Further, because the statute is unambiguous, the officer's mistaken belief that the driver violated the statute was not objectively reasonable under the agreed-to standard for reasonableness.

## I.      Applicable legal standard

Potter bears a threshold burden to show a Fourth Amendment violation in support of his motion to suppress, which he has met. United States v. Young, 835 F.3d 13, 19 (1st Cir. 2016); see also Rakas v. Illinois, 439 U.S. 128, 132 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."). This includes the "burden of establishing that he was seized" or searched without a warrant. United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016). Once Potter shows that a warrantless search or seizure occurred, the government bears the burden of proving, by a preponderance of the evidence, that the warrantless search or seizure was nevertheless lawful. See United States v. Matlock, 415 U.S. 164, 178 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." (citing Lego v. Twomey, 404 U.S. 477, 488-89 (1972))); United States v. Schaefer, 87 F.3d 562, 569 (1st Cir.1996) ("The government bears the burden of proving by a preponderance of the evidence that" the consensual search exception to the warrant requirement applies).

## II.      Background

The court makes the following findings of fact based on the testimony and other evidence submitted at the suppression hearing. The government called Officer Nicholas Kapteyn of the Hooksett Police Department as a witness, and Potter called Federal Public Defender Investigator

J. Arsenault.  The parties entered several exhibits into evidence by agreement, including the relevant police report.  The court also took a "view" of the intersection in question prior to the suppression hearing by driving through it several times.  Neither party objected to the court's view or moved to exclude it from consideration.[3]

On May 31, 2021, shortly before 7:00 p.m., Officer Kapteyn was driving northbound in his marked cruiser on Hooksett Road in Hooksett, New Hampshire, near the intersection of Legends Drive and Lindsay Road.[4]  The northbound side of Hooksett Road is a two-lane road as it approaches the intersection with Legends Drive.  Officer Kapteyn was driving in the left lane.[5]  After the intersection with Legends Drive, the northbound lanes of Hooksett Road merge together and eventually narrow into a one-lane road.[6]  Before the dotted line separating the two lanes ends, there is a sign on the right side of the road indicating that the two lanes become one.[7]  The court will refer to this portion of Hooksett Road as the "narrowing point."  The photograph below depicts the narrowing point.[8]

---

[3] Transcript for January 6, 2022 Hearing on Motion to Suppress (doc. no. 26) [hereinafter "T."], at 3-4.

[4] Id. at 6:17-23.  Legends Drive intersects with Hooksett Road from the West, while Lindsay Road intersects with it from the East.

[5] Id. at 6:25-7:2.

[6] Id. at 7:3-4.

[7] Id. at 7:19-21.

[8] This is a cropped image of a screen shot from Google Maps of the northbound side of Hooksett Road.  This image shows a driver's vantage point when traveling north and passing through the intersection with Legends Drive.



And this photograph depicts the narrowing point from above.



The following depicts the sign that appears before the narrowing point:



The sign does not resemble the actual roadway or the configuration of the narrowing point, which does not present a termination of the right lane or require a lane change, abrupt shift, or the crossing of a middle or dotted line.  About 1.5 miles north of this sign, the roadway presents a somewhat similar, but not identical, narrowing point.  The signage there, however, contains not only the diagram depicted above, but also the words "Right Lane Ends."[9]

Officer Kapteyn observed a gray Volkswagen Jetta that was travelling in the right lane before the narrowing point "start[] to merge left or move left" in front of his cruiser after the dotted line distinguishing the two lanes ended, without using a signal.[10]  Importantly, Officer Kapteyn did not see the vehicle execute a lane change, or cross the dotted line.  Officer Kapteyn, believing that the driver of the Jetta had committed a traffic violation by failing to signal, activated his blue lights and stopped the vehicle.[11]

---

[9] See id. at 57:4-10.

[10] Id. at 7:4-7, 9:19-22 ("After the dotted white line distinguishing between the two lanes ended, [the Jetta] started to merge left or move left.").

[11] Id. at 7:8-11.

Officer Kapteyn approached the vehicle, identified himself to the driver and passenger, and explained the reason for the stop.[12]  The driver, Shana Booth, provided her license to the officer.[13]  Officer Kapteyn asked the passenger, Potter, if he would be willing to identify himself. Potter told the officer that he did not have an identification on him, and then incorrectly identified himself as "Jason Brady."[14]

Officer Kapteyn eventually learned of Potter's true identity and confirmed that he had outstanding arrest warrants in two New Hampshire counties.  Potter was then handcuffed, placed under arrest, and put in the back of Officer Kapteyn's cruiser.[15]  Officer Kapteyn then seized Potter's black bag and searched it prior to transporting Potter to the county jail for his pending warrants.  He found suspected narcotics inside the bag, leading to an indictment charging Potter with Possession with Intent to Distribute Controlled Substances, 21 U.S.C. §§ 841(a)(1) & (b)(1)(C).[16]

## III.   <u>Analysis</u>

The court acknowledges that what follows may appear as an excessively lengthy, highly formalistic, analysis of a simple traffic law.  As more fully explained <u>infra</u> Section IV, however,

---

[12] <u>Id.</u> at 14-15.

[13] <u>Id.</u> at 15.

[14] <u>Id.</u>

[15] Officer Kapteyn provided additional details about the stop at the suppression hearing, but the court does not repeat them here because they are not relevant to the main issue raised by Potter's suppression motion.

[16] <u>See</u> Indictment (doc. no. 1).

the downstream constitutional question warrants the time and care expended in the analysis of the statute.

The crux of Potter's suppression motion is the constitutionality of Officer Kapteyn's stop, as the seizure of incriminating evidence and allegedly inculpatory statements flow from that stop. "A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." Heien v. North Carolina, 574 U.S. 54, 60 (2014) (quoting Brendlin v. California, 551 U.S. 249, 255-259 (2007)). To justify this type of seizure, the traffic stop must either be based on "probable cause to believe that a traffic violation has occurred" or "reasonably grounded" suspicion that "criminal activity is afoot." Whren v. United States, 517 U.S. 806, 810 (1996); Arizona v. Johnson, 555 U.S. 323, 330 (2009).

Officer Kapteyn's sole basis for stopping Booth was her failure to use a signal when moving through the narrowing point on Hooksett Road, which Officer Kapteyn considered a violation of RSA 265:45. This statute ("signaling statute"), entitled "Turning Movements and Required Signals," provides as follows:

**265:45 Turning Movements and Required Signals**

I. No person shall *turn* a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in RSA 265:42, or *turn* a vehicle to enter a private road or driveway, or *otherwise turn* a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety. **No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided.**

II. **A signal of intention *to turn* right or left when required** shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning.

III. No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal.

IV. **The signals provided for in RSA 265:46, II, shall be used to indicate an intention to turn, change lanes, or start from a parked position** and shall not be flashed on one side only on a parked or disabled vehicle, or flashed as a courtesy or "do pass" signal to drivers of other vehicles approaching from the rear.

RSA 265:45 (emphasis added).  Section IV references Section II of RSA 265:46, which requires the use of "lighted signal lamps," as opposed to "the hand and arm," for vehicles of a particular size.

Potter argues that this statute unambiguously did not require Booth to use a signal under these circumstances.  He further contends that the officer's mistaken interpretation of the statute was not objectively reasonable.  As a result, according to Potter, the stop was not supported by probable cause or reasonable suspicion and therefore violated the Fourth Amendment.  The prosecution construes the statute differently and further argues that, to the extent that the officer mistakenly viewed the statute as requiring a signal under these circumstances, that belief was objectively reasonable.

The court begins by examining the New Hampshire signaling statute; throughout this analysis, the court follows the directive of the First Circuit Court of Appeals and applies New Hampshire principles and rules of statutory construction.  See Coffey v. New Hampshire Jud. Ret. Plan, 957 F.3d 45, 49 (1st Cir. 2020) ("To interpret a New Hampshire state statute, we employ New Hampshire interpretive methods and canons of construction.").  Then, the court will turn to the mistake-of-law analysis.

### A. Construction of the signaling statute

### i. Plain, ordinary meaning of the statute

To determine the meaning of a statute, the court "first look[s] to the language of the statute itself and, if possible, construe[s] that language according to its plain and ordinary meaning." State v. Surrell, 171 N.H. 82, 85 (2018) (internal quotation omitted); see also Bovaird

8

v. New Hampshire Dep't of Admin. Servs., 166 N.H. 755, 759 (2014) ("Words and phrases in a statute are construed according to the common and approved usage of the language unless from the statute it appears that a different meaning was intended.").  In assessing the language, the court "will neither consider what the legislature might have said nor add language that the legislature did not see fit to include."  State v. Smith, 163 N.H. 427, 428 (2012).  "When the language of a statute is clear on its face, its meaning is not subject to modification."  State v. Gardner, 162 N.H. 652, 653 (2011) (quoting Dalton Hydro v. Town of Dalton, 153 N.H. 75, 78 (2005)).

Furthermore, as is particularly important in this case, "if the language is plain and unambiguous," the court's analysis is complete, and the court "need not look beyond [the language] for further indication of legislative intent."  In re Guardianship of R.A., 155 N.H. 98, 99 (2007).

Following from these principles, the court begins its analysis with the words of the statute.  Section I provides that a driver must not undertake certain driving movements "unless and until such movement can be made with reasonable safety," including turning a vehicle at an intersection, turning a vehicle to enter a private road or driveway, or otherwise turning a vehicle from a direct course or moving right or left upon a roadway.  The first sentence does not require signaling for these four activities; it prohibits them, again, "unless and until" they "can be made with reasonable safety."  The second sentence of Section I then provides that a driver may not "so turn" a vehicle without giving an appropriate signal "in the manner hereinafter provided."  Sections II and IV provide that a driver must use a signal to indicate an "intention to turn right or left" and to indicate "an intention to turn, change lanes, or start from a parked position."  And Section III adds that a driver is prohibited from "stop[ping] or suddenly decreas[ing] the speed of

a vehicle without first giving an appropriate signal in the manner provided herein."  In plain terms, the signaling statute requires a signal before turning, changing lanes, or starting from a parked position.  See RSA 265:45, IV.  The question is whether Officer Kapteyn observed any one of these three occurrences.

He did not.  Officer Kapteyn observed the vehicle travel north on a roadway that itself merged two lanes into one.  Importantly, the term "merge" as used here signifies traveling forward on a straight roadway that narrows or blends two lanes into one, and not merging onto one road from another road.  By their plain and ordinary meaning, none of the enumerated acts in the statute refers to the vehicle progress that Officer Kapteyn observed.  A "familiar axiom of statutory construction" guides that "[n]ormally the expression of one thing in a statute implies the exclusion of another."  Joseph Hosp. of Nashua v. Rizzo, 141 N.H. 9, 11-12 (1996) (quoting In re Guardianship of Raymond E., 135 N.H. 688, 691 (1992)).  The enumeration of several acts that require a signal, while not including merging, moving right or left, or travelling on a roadway that narrows or merges from two lanes into one, means that the statute does not require drivers to use a signal in these three circumstances.

"The force of th[is] maxim . . . is strengthened where a thing is provided in one part of the statute and omitted in another[,]" as is the case here with respect to the act of "mov[ing] right or left upon a roadway."  City of Manchester v. Sec'y of State, 161 N.H. 127, 133 (2010), superseded on other grounds by statute.  Section I first prohibits vehicles from completing three types of turns "or mov[ing] right or left upon a roadway" unless the actions can be completed safely.  Its first sentence does not require or even mention signaling.  Then, in the very next sentence, Section I requires drivers to signal when "so turn[ing]."  That the statute includes the

word "turn" here but omits the terms "move" or "move right or left" confirms that a signal is not required for such movement.

The prosecution argues that the vehicle's movement on the road could be encompassed within two of the enumerated acts--changing lanes or turning.  See RSA 265:45, I, IV.  This argument falters when tested against the physical realities of the road and familiar rules of statutory interpretation.

First, the prosecution attempts in vain to complicate the ordinary meaning of a lane change by referencing a 2009 report from the National Highway Traffic Safety Administration, which begins by stating that a lane change is the "mov[ement] [of] a vehicle from one lane to another where both lanes have the same direction of travel."[17]  Then, the NHTSA describes the steps to completing a lane change--a steering input, a change in direction, lateral movement, and, finally, placement in an adjacent lane.[18]  In the unlikely event that this court would employ a 2009 pronouncement of a federal administrative agency to determine the ordinary meaning of a phrase in a statute that the New Hampshire legislature last amended in 1981, and adopt the NHTSA's definition of a lane change, it cannot be read to include or even address the circumstances present at the narrowing point on Hooksett Road.  After the dotted line ends, there are no longer multiple lanes available to enter or exit.  Instead of relying on the NHTSA's explanation of a lane change, the court looks to the common, ordinary meaning of the term--a departure from one lane and the entry into an adjacent, parallel lane--a definition that does not conflict with that of the NHTSA.

---

[17] Gov.'s Supp. Br. (doc. no. 32) at 4.

[18] Id. at 4-5.

Based on photographs of the narrowing point included in this order; other similar photographs in the record; videos of cars driving through the narrowing point, which were presented during the suppression hearing; and the court's own observations from its view of the area, the narrowing point does not require vehicles to complete a lane change.  There is no jagged cut or even a visible shift where one lane definitively ends at or after the narrowing point. Rather, after the dotted line ends, the road gradually narrows from the width of the former two lanes to the width of a single lane.  Thus, cars passing through the narrowing point can continue moving along the roadway, either straight or veering right or left within the single, narrowing lane, but they do not move laterally to arrive in an adjacent, parallel lane with marked boundaries.

During the court's view of the narrowing point, which included several drives through it, originating from each of the two lanes, the court learned that nothing like a lane change, or even a traditional merge onto a roadway, is experienced or executed by the driver.[19]  After progressing past the end of the divided lanes, a driver just follows the "outside" lines while continuing in the same direction, as the two lanes gradually and almost imperceptibly blend into one lane.  A vehicle's movement right or left while passing through the narrowing point does not constitute a change of lanes, but rather just forward progress within a single, narrowing lane, executed by following a smooth, straight path.[20]  See Mahaffey v. State, 364 S.W.3d 908, 913 (Tex. Crim.

---

[19] Neither the defendant's witness, who observed and recorded traffic moving through the intersection over time on the afternoon of September 29, 2021, nor the court, during its view of the roadway, observed a single instance in which a vehicle signaled while proceeding through the narrowing point.  See T. at 63:23-64:6, 70:21-23.  Such observations do not aid in interpreting the language of the statute, which is the crux of the court's analysis, but solely concern (and provide context regarding) the roadway to which the statute would apply here.

[20] The prosecution presents two pieces of evidence to attempt to refute this physical description of the road--Officer Kapteyn's testimony describing the narrowing point and the "lane ends"

App. 2012) (Mahaffey II) (holding that a similar movement was not a lane change under a similarly worded, unambiguous Texas signaling statute).  If the sign at the narrowing point is meant to suggest that one of the two lanes ends, it (unlike the sign immediately to the north on Hooksett Road, see supra Section II) does not specify which lane ends, and there is nothing about the narrowing point that requires moving from one demarcated lane to another.

Next, Section I also confirms that, contrary to the prosecution's contention, the vehicle's leftward movement within the road cannot be considered a turn, because the statute treats moving right or left and turning as different actions.  See Hendrick v. New Hampshire Dep't of Health & Hum. Servs., 169 N.H. 252, 259-60 (2016) (citation omitted) (noting that statutory language is read "in the context of the overall statutory scheme and not in isolation.").  Again, Section I states that drivers shall not "turn a vehicle at an intersection . . . , turn a vehicle to enter a private road . . . , or otherwise turn a vehicle from a direct course[21] or move right or left upon a roadway" unless the movement "can be made with reasonable safety."

---

street sign present before the narrowing point.  See New Hampshire Driver Manual (doc. no. 14-5) at 27 (depicting the street sign at the narrowing point as signifying that a lane is ending, but not specifying which lane is ending).  First, while the court does not find Officer Kapteyn's testimony to be false or given in bad faith, it does not effectively counter the photographs and videos of the narrowing point or the court's own observations while driving through the narrowing point when it took a view of the roadway.  Next, to the extent that the road sign is pertinent to the court's analysis, it cannot serve to reimagine the physical realities of the road.  Further, the sign is consistent with the court's description of two lanes blending, just as it is consistent with the right lane ending, since the signs as defined in the Driver Manual does not draw a distinction between these two scenarios.  The court further addresses the signage and the Manual infra.

[21] The prosecution focuses on this type of a turn and asserts that, since passage through the narrowing point "invariably requires turning the steering wheel to physically shift the vehicle's direction away from a straight course," the vehicle's progress constituted a turn, which requires a signal.  Gov.'s Supp. Br. (doc. no. 32) at 4.  The prosecution's characterization directly contradicts specific findings the court made on the record (based on photographs, videos, and its viewing of the narrowing point) that this part of the road does not require making a movement

The use of the conjunction "or" between "turn" and "move right or left" indicates that the actions on either side of the conjunction are separate and distinct, since "or" is "defined as 'a function word to indicate an alternative between different or unlike things.'" Merrill v. Great Bay Disposal Serv., Inc., 125 N.H. 540, 543 (1984) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 728 (1961)); see also Loughrin v. United States, 573 U.S. 351, 357 (2014) (rejecting the argument that, where two phrases in the subject statute were connected by "or," the second phrase could be considered a "subset" of the first, as that "effectively reads 'or' to mean 'including'—a definition foreign to any dictionary we know of."). Moreover, if the court were to conclude that 'moving right or left' is no different from 'turning,' one of the terms would be rendered redundant or mere surplusage. Such a construction cannot stand, since "[t]he legislature is not presumed to waste words or enact redundant provisions." Marcotte v. Timberlane/Hampstead Sch. Dist., 143 N.H. 331, 339 (1999); see also Merrill v. Great Bay Disposal Serv., Inc., 125 N.H. 540, 543 (1984) (same).[22]

---

left or right, but rather requires drivers to continue along the roadway as the two former lanes blend into one and the road gradually narrows. See T. at 118:16-119:5

[22] The prosecution asserts that the absence of a comma between "otherwise turn" and "move[ment] right or left upon a roadway" in Section I indicates that the latter term is encompassed within the former term. To the extent that one might draw that inference from the omission of a comma, punctuation alone cannot serve to overcome the clear indications within the statute's language of the legislature's intent to treat 'turn' and 'move[ment] right or left' as distinct actions. See SUTHERLAND STATUTORY CONSTRUCTION § 47:15 (7th ed. 2021) (though "[p]unctuation may be helpful evidence to understand legislative intent or statutory meaning[,] . . . when punctuation is inconsistent with a statute's otherwise established clear intent or meaning, courts should disregard the punctuation or repunctuate the act to effect legislative intent or statutory meaning"); WILLIAM N. ESKRIDGE, JR., ET AL., CASES AND MATERIALS ON LEGISLATION AND REGULATION, STATUTES AND THE CREATION OF PUBLIC POLICY (6th ed. 2020) (noting that the majority approach is that punctuation is looked at as "as a less-than-desirable, last-ditch alternative aid in statutory construction") (quoting Ray Marcin, Punctuation and the Interpretation of Statutes, 9 Conn. L. Rev. 227, 240 (1977)).

Familiar statutory canons – the presumption of consistent usage and the rule of meaningful variation – also preclude the prosecution's preferred interpretation.  It is presumed that "the legislature's consistent use of" the same word is "intended to convey the same meaning."  N. New England Tel. Operations, LLC v. Town of Acworth, 173 N.H. 660, 681 (2020) (internal citations omitted).  By the same logic, "[w]here a statute repeatedly uses one term or phrase, one expects that a materially different phraseology demands a different reading."  WILLIAM N. ESKRIDGE, JR., INTERPRETING LAW 110 (2016); see also State v. Bakunczyk, 164 N.H. 77, 79 (2012) ("when the legislature uses two different words, it generally means two different things").  Thus, the court must conclude that the phrase 'or move[ment] left or right' after the third, repeated use of the word 'turn' in Section I does not modify or expand the meaning of the word 'turn.'  Rather, the legislature introduced different words that describe a new, distinct category of vehicle movement, and used 'turn' repeatedly elsewhere in the statute in a consistent manner.

This distinction increases in significance in the last sentence of Section I.  The first sentence requires safe operation while executing a "turn . . . at an intersection[,]" a "turn . . . to enter a private road or driveway," a "turn . . . from a direct course[,]" or a "move[ment] right or left upon a roadway[.]"  But the second sentence, requiring signaling, omits movement right or left and mandates signaling only for "turn[s]."

The prosecution tries to avoid the plain meaning of the statute by stating, in passing, that "move right or left upon a roadway" is a "catchall" phrase for a type of turning movement.[23] The phrase "move right or left upon a roadway" does not present the characteristics of a catchall phrase, however.  A catchall follows specific terms and employs general terms; once identified, a

---

[23] Gov.'s Supp. Br. (doc. no. 32) at 5.

catchall is "construed to embrace objects [or items] similar in nature to those . . . enumerated by the preceding specific words." SUTHERLAND STATUTORY CONSTRUCTION § 47:17 (7th ed. 2021). The phrase "move right or left" is preceded by a list consisting of two specific types of turns and then a general phrase capturing a broad set of turns ("otherwise turn a vehicle from a direct course"). See RSA 265:45, I.  In this context, "move right or left upon a roadway" cannot reasonably be read as a general set of words that serves as a catchall for various turns.  It is more naturally read as a particular set of terms that breaks away from the list of turns and describes a new, distinct category of vehicle movement.

The prosecution also disputes the plain meaning of the statute by suggesting that it leads to an absurd result, whereby a leftward movement before the end of the dotted lines would require a signal, and the same movement after the end of the dotted lines would not.  That is not an absurd result; it makes good sense.  The movement completed by a driver before and after the end of the dotted line is distinct, such that the requirement of a signal in the former situation, and not the latter, is not absurd.  While the dotted line exists, the roadway consists of two lanes, and drivers must complete a lateral movement to move from one lane to the other.  In this scenario, the signal indicates to other drivers that a car is taking an otherwise unforeseen or unexpected change in course.  After the dotted line ends, drivers continue along the roadway by moving straight or being guided slightly left or right by the outside lines, but not by moving laterally, in order to remain between the boundaries of a wide, single lane that narrows gradually.  In this scenario, a signal would provide no alert or indication to other drivers regarding a car's movement that is not otherwise apparent or expected from the shape and nature of the roadway.

In the simplest terms, the signaling statute requires traffic signaling before what it describes as "turn[s]," RSA 265:45, I, and it specifies those instances as turning, changing lanes,

or entering the roadway from a parked position, RSA 265:45, IV.  The narrowing point does not require a turn, a lane change, or even a merge onto a road from a parked position or from another roadway.  And the statute does not require signaling before the movements taken at the narrowing point--"merging" (a very commonplace, ordinary term)[24] or proceeding straight along a roadway that merges or narrows from two lanes into one.  See Mahaffey v. State, 316 S.W.3d 633, 643 (Tex. Crim. App. 2010) (Mahaffey I) (holding that a similar movement was not a "turn" under a similarly worded Texas signaling statute).

Having rejected the prosecution's contention that the vehicle's movement on the road is encompassed within the statute's enumerated acts of turning or changing lanes, the court concludes that the prosecution's interpretation of the statute necessarily (and impermissibly) requires the court to "consider what the legislature might have said [or] add language that the legislature did not see fit to include."  Smith, 163 N.H. at 428.   Adding the word 'merge' to the list of enumerated acts would be particularly ill-advised, given that it is a familiar and available term that the legislature could have readily incorporated into the statute.  And adding 'move[ment] right or left' to Section IV's enumerated acts would undermine the legislature's inclusion of the phrase in Section I among a list of movements that should be completed safely, and its exclusion from the list of acts in Section IV that require a signal.

---

[24] If further confirmation that the statute does not require signaling before merging is needed, the requirement to signal when a car enters the roadway "from a parked position" seals the deal.  Id. The court returns again to the familiar maxim that "the expression of one thing in a statute implies the exclusion of another."  Rizzo, 141 N.H. at 11-12 (quoting In re Guardianship of Raymond E., 135 N.H. at 691).  By specifying that entry onto a roadway from a parked position requires a signal, the statute, by omission, does not require a signal when vehicles enter the road while traveling, for example, from an on-ramp or (as is the case here) while a wider roadway narrows after the end of a divided, two-lane stretch of road.

An important point about ambiguity is worth noting here.  In concluding that the statute is not ambiguous, the court need not find that it has presented the only plausible construction of the statute.  As our Court of Appeals has stated, "genuine ambiguity requires more than a possible alternative construction." United States v. Jimenez, 507 F.3d 13, 21 (1st Cir. 2007) (internal citation omitted) (commenting on the rule of lenity's threshold requirement of ambiguity); see also Rosmer v. Pfizer Inc., 263 F.3d 110, 118 (4th Cir. 2001) (stating that, if courts could "automatically call a statute ambiguous because a sister circuit has interpreted [it] in a contrary manner" courts would "[i]n effect . . . abandon[] [their] duty to interpret the law.").  The court finds that, when considered within the context of the statute as a whole, the language of the signaling statute is clear and unambiguous, notwithstanding any other potentially plausible interpretations of the statute or isolated words and phrases within it.  See In re Price, 370 F.3d 362, 368-69 (3d Cir. 2004) (noting that "[s]tatutory context can suggest the natural reading of a provision that in isolation might yield contestable interpretations" and concluding that the "range of views among the courts of appeals" regarding the meaning of a portion of a statute did not render the statute ambiguous); Gov.'s Supp. Br. (doc. no. 32) at 7-15 (describing district court opinions in which similar signaling statutes may have been interpreted differently).

### ii. Statutory construction where ambiguity exists

Since the statute's language is "unambiguous," the court's analysis is complete, and the court "need not look beyond [the statute] for further indication of legislative intent." In re Guardianship of Kapitula, 153 N.H. 492, 494 (2006).  But even if the statute's language were ambiguous, as the prosecution contends, and the court needed to rely on external aids to interpret its meaning, the court's construction would still stand.

In this case, both parties point to the New Hampshire Driver Manual, issued by the New Hampshire Department of Safety, as a source of administrative gloss that can facilitate the interpretation of the statute.  New Hampshire's "administrative gloss" doctrine provides that "a longstanding practical and plausible interpretation given a statute of doubtful meaning by those responsible for its implementation without any interference by the legislature is evidence that such a construction conforms to the legislative intent."  New Hampshire Retail Grocers Ass'n v. State Tax Comm'n, 113 N.H. 511, 514 (1973).  Importantly, "[t]he administrative gloss doctrine applies only when a statute is ambiguous," which is not the case here.  New Hampshire Ctr. for Pub. Int. Journalism v. New Hampshire Dep't of Just., 173 N.H. 648, 657 (2020).  Thus, the Manual is not applicable to the court's analysis.  It does, however, confirm the interpretation drawn from the plain language analysis above.

After describing how to appropriately signal, the Manual provides that "[d]rivers must use the appropriate turn signal when [c]hanging lanes[;] [t]urning at an intersection[;] [e]ntering or leaving a highway or roadway[;] [t]urning into a driveway[;] [m]erging onto another road[;] [p]ulling away from a curb[;] [p]ulling over to the side of the road[;] [and] [p]assing another vehicle[.]"[25]  Since the court must "apply the same principles of construction in interpreting both" statutes and regulations, it begins by assigning the terms in the Manual their plain and ordinary meaning.  New Hampshire Resident Partners of Lyme Timber Co. v. New Hampshire Dep't of Revenue Admin., 162 N.H. 98, 101 (2011).  The court concludes that none of these terms refer to or encompass the merging movement here, or moving right or left on a roadway without changing lanes--confirming that these actions need not be preceded by a signal.  The

---

[25] New Hampshire Driver Manual (doc. no. 14-5) at 15.

Manual's list does include "merging onto another road," but that is clearly not the situation at the

narrowing point.[26]

Finally, the prosecution points to two New Hampshire Supreme Court decisions

describing the purpose of the signaling statute as an additional aid to interpretation.  According

to these decisions, the purpose of a predecessor statute governing signaling was to "prevent

collision with other vehicles as a result of a change in direction or speed without warning."[27]

Caldwell v. Drew, 109 N.H. 91, 94 (1968); Sullivan v. Le Blanc, 100 N.H. 311, 314 (1956).

When presenting these decisions, the prosecution urges the court to place weight on them in part

because "the state's highest court has not spoken directly to [the] issue" at hand pertaining to the

signaling statute, so the court must "make an informed prophecy as to the state court's likely

stance."  United States v. Tavares, 843 F.3d 1, 14-15 (1st Cir. 2016) (internal quotation omitted).

The New Hampshire Supreme Court's description of the purpose of the predecessor

statute, while certainly reasonable, does not meaningfully inform, nor does it alter, the court's

analysis for a few reasons.  First, again, the court need not consider extrinsic sources of

---

[26] The administrative gloss doctrine bears some similarity to the familiar federal Skidmore and
Chevron doctrines, though it is not identical.  But it is not readily apparent to the court whether
the Manual actually rises to the level of "administrative law" that might constitute an
interpretative aid under the doctrine.  Neither party has explained the authority under which the
Manual was produced or what administrative process the New Hampshire Department of Safety
undertook to create it.  Because the Manual ultimately does not impact the court's understanding
of an unambiguous statute, and would confirm that understanding even if it did, the court has not
independently researched or considered the status of the Manual under New Hampshire
administrative law or the "administrative gloss" doctrine.

[27] The prosecution also notes that the New Hampshire Supreme Court's description of the
purpose of the statute comports with Officer Kapteyn's belief regarding the statute's purpose.
See Gov's Supp. Br. (doc. no. 32) at 5-6 (citing T. at 54:13-18, 56:17-24).  The court does not
take this statement into consideration when interpreting the statute because the government does
not provide any authority (nor does the court know of any) supporting the proposition that an
officer's subjective view of the purpose of a statute is a relevant aid to statutory construction.

interpretation such as purportedly identifiable statutory purpose, or anything else beyond the language of the statute where, as here, the language is unambiguous.  See Hogan v. Pat's Peak Skiing, LLC, 168 N.H. 71, 74-75 (2015) (turning to the policy interests animating the statute as an aid to interpretation after finding the language ambiguous and the legislative history "not helpful" in resolving the ambiguity); State Employees' Ass'n of New Hampshire, Inc., SEIU Loc. 1984 v. State, 161 N.H. 558, 561 (2011) ("When statutory language is ambiguous, however, we will consider legislative history and examine the statute's overall objective" (citing Favazza v. Braley, 160 N.H. 349, 351 (2010)).

Second, even if the court were to consider the New Hampshire Supreme Court's description of the purpose of the statute, there is no basis for the court to find that imposing a signal requirement for drivers proceeding through the narrowing point would reduce the likelihood of a collision and thereby further the statute's purported purpose.  As previously explained, drivers follow a conventional, predictable course when proceeding through the narrowing point because there are no other options.  See supra Section III.A.i.  Finally, in order to "prophe[size] as to the state court's likely stance" on the meaning of the signaling statute, the court has followed established principles of statutory construction that the New Hampshire Supreme Court has repeatedly employed and embraced.  In this way, the court has pursued an approach that is supported by New Hampshire law.

In sum, the prosecution's advocacy that this court consider extrinsic aids to statutory construction of an unambiguous statute cannot and does not persuade the court that the meaning of RSA 265:45 differs from what its plain language provides.

### B.  Reasonable mistake of law

The government also argues that the statute's meaning is ambiguous, so, even if Officer Kapteyn's construction of the statute was mistaken, the traffic stop was lawful because the officer's mistake was objectively reasonable.  An officer's probable cause or reasonable suspicion to believe that a traffic violation has occurred "can rest on a mistaken understanding of the scope of a legal prohibition."  Heien, 574 U.S. at 60.  The officer's mistake, however, must be "objectively reasonable"; his subjective understanding is irrelevant.  Id. at 66.  "[A]n officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce."  Id. at 67.[28]  In her concurrence in Heien, Justice Kagan (joined by the late Justice Ginsburg), shed additional light on "the appropriate standard for deciding when a legal error can support a seizure."  Id. at 69 (Kagan, J., concurring).  Justice Kagan suggested that "the test is satisfied when the law at issue is 'so doubtful in construction' that a reasonable judge could agree with the officer's view."  Id. at 70 (quoting The Friendship, 9 F.Cas. 825, 826 (No. 5,125) (C.C.D.Mass.1812)).  Justice Kagan's "reasonable judge" standard is urged on the court by the government here[29] (and has been applied by our Court of Appeals, see infra), and the court will apply it in the absence of any other standard suggested by either party.

The court's task is therefore a "straightforward question of statutory construction.  If the statute is genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work, then the officer has made a reasonable mistake.  But if not, not."  Id. (emphasis added); see also United States v. Hinton, 773 F. App'x 732, 734 (4th Cir. 2019)

---

[28] This is not to suggest that Officer Kapteyn's work here was sloppy.  His interpretation of RSA 265:45 was merely incorrect, and not reasonably so.

[29] See doc. no. 32, at 1-2.

(unpublished) ("An officer's mistake of law may be reasonable if the law is ambiguous, such that reasonable minds could differ on the interpretation, or if it has never been previously construed by the relevant courts."); United States v. Diaz, 854 F.3d 197, 204 (2d Cir. 2017) (officer's "assessment was premised on a reasonable interpretation of an ambiguous state law, the scope of which had not yet been clarified" and other New York courts had reached conflicting conclusions); United States v. Stanbridge, 813 F.3d 1032, 1037 (7th Cir. 2016) (concluding that statutory ambiguity is a prerequisite to a determination that an officer's mistake of law was objectively reasonable); United States v. Alvarado-Zarza, 782 F.3d 246, 250 (5th Cir. 2015) (same).

The First Circuit Court of Appeals has applied Justice Kagan's "framework" for determining whether an officer's interpretation of a traffic statute was objectively reasonable. United States v. Lawrence, 675 F. App'x 1, 3 (1st Cir. 2017).[30]  Whether Officer Kapteyn made a reasonable mistake in interpreting RSA 265:45 thus turns on whether the statute is genuinely ambiguous and whether the officer's judgment requires hard interpretative work.  The court concludes, based on the analysis above (supra, Section III.A.i) that the signaling statute is not so doubtful in construction that it is genuinely ambiguous, and it did not require the Jetta to signal.

---

[30] The Lawrence Court found that it would require "hard interpretative work" to overturn the officer's judgment that a Massachusetts traffic law that requires vehicles to drive within one lane and move between lanes carefully "forbids drivers, on roads divided into lanes, from straying across a fog line."  Id. at 4.  "[G]iven the statute's language and the lack of any definitive commentary on the issue by Massachusetts courts," the court concluded that "the statute's application to the facts of this case" was "at best ambiguous."  Id. at 5.  Indeed, in Lawrence, unlike here, the First Circuit Court of Appeals found the statute's language ambiguous as to the facts of the case, and other judges in Massachusetts had reached differing conclusions as to whether crossing the fog line constituted a marked lane violation.  Id.  The officer's understanding of the statute was therefore objectively reasonable and his stop of the defendant's car was lawful under the Fourth Amendment.  Id. at 6.

Further, reaching this conclusion does not require difficult interpretative work.  Because the parties' arguments, and this court's resolution of the issue, go to some length in interpreting a simple traffic statute, one might conclude that the court's ruling required "hard interpretive work."  But that would be a misunderstanding of what interpretation entails, and what, as a result, constitutes hard interpretive work.  Interpretive work is what is required when a statutory word, phrase or provision is ambiguous.  The ambiguity requires interpretation, sometimes entailing both intrinsic and extrinsic tools and methods.  But where, as here, the ordinary meaning of the statutory text is clear, no "interpretive" work, much less hard work, is required.  Indeed, such "difficult" interpretative work or "very hard question[s] of statutory interpretation" supporting a reasonable mistake are "exceedingly rare."  Heien, 574 U.S. at 70 (Kagan, J., concurring).

Moreover, the length of this ruling does not signify hard interpretive work; rather, the court has merely sought to address the prosecution's many arguments.  This requires reasoning and analysis, but where the arguments do not reveal ambiguity, or seek to resolve ambiguity, such reasoning and analysis are not interpretive in nature.  They are merely legal reasoning, with no actual interpretation.  Officer Kapteyn's mistaken understanding of the statute was therefore not objectively reasonable, and his stop violated the Fourth Amendment.  See United States v. Flores, 798 F.3d 645, 646 (7th Cir. 2015) (statute unambiguously directed that a license plate's information must be clearly visible and legible, and though the driver's plate was partially obscured, it was still visible and legible, so the police officer's finding of a violation was not objectively reasonable); United States v. Williams, No. PWG-19-134, 2019 WL 4415540, at *7 (D. Md. Sept. 16, 2019) ("just like a reasonable officer in Flores could read the license plate and determine that it was legible under the plain meaning of the relevant statute, a reasonable officer

here only could conclude that Williams was parked and not on a highway, and therefore did not meet the requirements for a tail or tag light violation under the plain meaning of the Transportation Code.").

In support of its argument that Officer Kapteyn's mistaken interpretation of the statute was objectively reasonable, the government cites several cases from other jurisdictions in which courts concluded that other states' signaling statutes require drivers to signal under allegedly similar circumstances.[31]  It contends that these cases show that reasonable judges could agree with Officer Kapteyn's interpretation of RSA 265:45.  The court disagrees.

First, this argument ignores the central tenet of the reasonable mistake doctrine: the statute at issue must be "genuinely ambiguous" in order for the officer's mistake to be objectively reasonable.  As shown above, RSA 265:45 has only one reasonable construction and is thus unambiguous as applied to the facts of this case.  See Kisor v. Wilkie, 139 S. Ct. 2400, 2415 (2019) (noting that a regulation is genuinely ambiguous when it has "only one reasonable construction").  It requires signaling before turns, lane changes, and entering a road from a parked position, but not for merging without a lane change within the same road, or traveling through the narrowing point.  Therefore, whether courts outside New Hampshire have construed their state signaling statutes differently under different factual circumstances does not render RSA 265:45 genuinely ambiguous.  See Reno v. Koray, 515 U.S. 50, 64-65 (1995) (finding, in the rule of lenity context, that a "statute is not 'ambiguous' . . . merely because there is a division of judicial authority over its proper construction") (internal quotation marks omitted)).  Second, the out-of-state decisions cited by the prosecution have limited persuasive value because they are grounded on differently worded and structured statutes than RSA 265:45.  Cf. New Hampshire

---

[31] See doc. no. 32, at 6-14.

Ctr. for Pub. Int. Journalism, 173 N.H. at 653 (recognizing that courts may "look to the decisions of other jurisdictions interpreting similar acts for guidance . . . .  Such similar laws, because they are in pari materia, are interpretatively helpful, especially in understanding the necessary accommodation of the competing interests involved." (quotation omitted) (emphasis added)).

For example, the prosecution points to United States v. Morales from the District of Kansas as "instructive" of the "correct legal path to follow here."[32]  See 115 F. Supp. 3d 1291 (D. Kan. 2015).  But Morales is inapposite because the signaling statute at issue there expressly required a signal for "mov[ing] right or left upon a roadway."  See K.S.A. 8-1548(a).  New Hampshire's statute is worded and structured differently.  In the New Hampshire statute, moving left and right is expressly included in the first sentence of Section I requiring "reasonable safety," but omitted from the next sentence of Section I regarding signaling.  See supra Section III.A.i. And, importantly, it explicitly requires signals "to indicate an intention to turn, change lanes, or start from a parked position," not to move right or left upon a roadway.  RSA 265:45, IV. Morales is also distinguishable because Kansas courts had previously interpreted the statute at issue and held that it required a signal under similar factual circumstances, as the police officer concluded in Morales.  Here, by contrast, no New Hampshire court has interpreted RSA 265:45 (like Officer Kapteyn) as requiring a signal under these circumstances.  And of course, this court's construction is not binding New Hampshire law.  It is merely part of the analysis in a suppression motion in a federal criminal case.

The government compounds its misplaced reliance on Morales by incorrectly framing the objective reasonableness question as whether the officer's interpretation is "open to reasonable

---

[32] Id. at 6.

debate."[33]  But for an officer's interpretation of a statute to be objectively reasonable, there must

be "genuine ambiguity" in the statute, and "a statute is not ambiguous simply because litigants

(or even an occasional court) question its interpretation."  United States v. Dwinells, 508 F.3d

63, 69-70 (1st Cir. 2007) (citations omitted).  The standard is applied from the standpoint of a

jurist, a "reasonable judge," Heien, 574 U.S. at 70 (Kagan, J., concurring), and not simply a

common sense-based discussion between practitioners or lay people.  It is also superficially

tempting to authorize the seizure as reasonable because Officer Kapteyn's stop appears to have

been conducted in good faith (it was not an intentional distortion of the law) and does not elicit

an immediate sense of injustice or outrage.  It "seems" like a reasonable traffic stop.  But that

would be a misapplication of the Heien concurrence standard, which does not ask if the

interpretation of the statute was reasonable from a police officer's perspective.

A reasonable judge would not find the statute ambiguous for the reasons explained supra.

And ambiguity is required to invoke the reasonable mistake doctrine.  But a reasonable judge (as

opposed to a police officer), and one with the view that the statute is in fact ambiguous (a view

this court does not share), would be duty bound to consider whether this statute was:  (1) void for

vagueness; (2) subject to interpretation under the constitutional avoidance canon (see infra,

footnote 36); or (3) subject to the rule of lenity.  These doctrines would militate in favor of this

court's interpretation (at least), if not outright dismissal of the case or acquittal of the defendant

of a violation.  More importantly, no reasonable judge would fail to consider these rules and

doctrines in interpreting the statute if she viewed the statute as ambiguous.  The prosecution's

argument does not address these doctrines, and with one exception, the courts in the cases it cites

---

[33] Doc. no. 32 at 6.

do not.[34]  Officer Kapteyn's view of the statute was therefore not a "reasonable" mistake of law under Justice Kagan's expressly judge-centric standard, even if the stop itself does not strike one as immediately or obviously unreasonable.

The government next argues that People v. James from the Criminal Court of Queens County, New York suggests that Booth's vehicle movement constituted a "turn."  See 842 N.Y.S.2d 859, 860 (Crim. Ct. Queens Co. 2007).  This decision is similarly unhelpful.  In James, the court adopted a construction of the statute that treated the words "move right or left upon a roadway" as a catchall type of "turn," which, as discussed above (see supra, Section III.A.i), is a plainly incorrect construction of the New Hampshire signaling statute.  Second, the decision is factually distinguishable because the driver was changing lanes from a traffic lane to a parking lane, not moving through a road that, after the end of a dotted line dividing two lanes, gradually narrowed into one lane, as here.  The court simply held that the statute required motorists to signal before changing lanes.  Here, Booth indisputably did not change lanes.  Third, James is legally distinguishable because a different New York court had previously construed the statute differently, whereas here, no New Hampshire court has construed RSA 265:45 under these circumstances, let alone adopted a different construction than this court.  And while the lack of any New Hampshire state case law applying RSA 265:45 to the facts presented here theoretically could weigh in favor of a finding of objective reasonableness, "lack of precedent alone cannot rehabilitate a statutory interpretation [like Officer Kapteyn's] that is unwarranted by the plain language and structure of the statute."  People v. Burnett, 2019 CO 2, ¶ 25, 432 P.3d 617, 623.

---

[34] Nor does this court, because the court finds no ambiguity and neither party raised these doctrines.

Further, the James Court's application of the "Title/Heading" rule of statutory interpretation was not consistent with its application by the Supreme Courts of New Hampshire and the United States.  Those courts have employed titles and headings in resolving ambiguity and in ascertaining legislative intent, neither of which is necessary to understand and apply New Hampshire's unambiguous signaling statute.  See INS v. National Center for Immigrants' Rights, Inc., 502 U.S. 183, 189 (1991) ("[W]e have stated that the title of a statute or section can aid in resolving an ambiguity in the legislation's text" (emphasis added)); Garand v. Town of Exeter, 159 N.H. 136, 142 (2009) ("While the title of a statute is not conclusive of its interpretation, it provides significant indication of the legislature's intent in enacting the statute." (emphasis added) (quoting State v. Gubitosi, 157 N.H. 720, 725 (2008))).  The James court found that, based on the title alone, the statute "contemplate[d] that a 'turn' is a 'movement' and a 'movement' is a 'turn.'"  James, 842 N.Y.S.2d at 861.  But "headings and titles are not meant to take the place of the detailed provisions of the text"; hence, "the wise rule [is] that the title of a statute and the heading of a section cannot limit the plain meaning of the text."  Brotherhood of R.R. Trainmen v. Baltimore & O.R. Co., 331 U.S. 519, 528-29 (1947).

Here, while there is no ambiguity in the text, the title of RSA 265:45, "Turning Movements and Required Signals," is nevertheless consistent with the idea that signaling is not required for every possible turn or movement listed in Section I.  Various events requiring safe operation are listed in Section I.  The required signals are listed in Sections II, III, and IV.  Titling the statute "turning movements and required signals" does not indicate that there is complete overlap between turning movements and movements requiring a signal.  To the extent that it indicates anything that might aid the interpretive endeavor if the statute were ambiguous, it is that the statute does two separate things:  (1) it lists out which events much be conducted

29

safely (first sentence of Section I); and (2) it lists out when signals are required (last sentence of Section I, Sections II, III, and IV).  See Gubitosi, 157 N.H. at 725 (noting that a statute's heading may indicate how the legislature intended the statute to apply).  The heading reflects the structure of the statute, which is to clearly distinguish safety requirements (general) from signaling (specific).

The government next relies on a series of decisions from various Texas state courts interpreting a similar Texas statute.  See, e.g., Mahaffey II, 364 S.W.3d at 909.  The government contends that because there were either dissenting opinions or contrary intermediate appellate court decisions (that higher courts later overruled) interpreting the Texas statute differently, this suggests there is genuine ambiguity in New Hampshire's signaling statute.  The majority opinions from the highest Texas Court of Criminal Appeals, however, support this court's construction of RSA 265:45.  Indeed, the controlling Mahaffey high court opinions hold that the exact movement of the vehicle in this case was neither a turn nor a lane change requiring a signal.  See Mahaffey I, 316 S.W.3d at 643; Mahaffey II, 364 S.W.3d at 913.  Moreover, the fact that a lower Texas court or dissenting judge interpreted a different statute incorrectly and was later reversed does not render RSA 265:45 genuinely ambiguous.  See Koray, 515 U.S. at 64-65 (1995) (a "statute is not 'ambiguous' . . . merely because there is a division of judicial authority over its proper construction" (internal quotation marks omitted)); see also Rosmer, 263 F.3d at 118 (If courts could "automatically call a statute ambiguous because a sister circuit has interpreted [it] in a contrary manner" courts would "[i]n effect . . . abandon[] [their] duty to interpret the law."); In re Price, 370 F.3d at 369 (concluding that the "range of views among the courts of appeals" regarding the meaning of a portion of a statute did not render the statute ambiguous).

The other decisions cited in the government's supplemental brief are either factually distinguishable, or inapposite because the statutes in question are materially different than RSA 265:45.  See, e.g., State v. Starr, 213 P.3d 214, 217 (Ariz. Ct. App. 2009) (factually distinguishable because the driver changed lanes on a highway from the left lane into the right lane and court found, as New Hampshire's statute similarly requires, that the lane change required a signal); State v. Belcher, 816 P.2d 1215 (Or. Ct. App. 1991) (factually distinguishable because the driver failed to signal when merging onto a highway); United States v. Gregoire, 425 F.3d 872 (10th Cir. 2005) (factually distinguishable because the driver was merging onto a highway and statutorily distinguishable because Utah statute, unlike RSA 265:45, see supra Section III.A.i, expressly required signaling when "mov[ing] right or left upon a roadway," turning, or changing lanes)[35]; Burton v. State Dep't of Transp., 240 P.3d 933, 936 (Idaho Ct. App. 2010) (statute expressly requiring signal for moving right or left on a roadway (unlike New Hampshire's statute) was void for vagueness as applied to the driver's situation where she was driving on a two-lane road that dropped to a one-lane road and the driver failed to signal)[36]; State

---

[35] The Gregoire decision further supports this court's interpretation of RSA 265:45 because the court found that a merge onto a highway (which required a move to the left) was not a lane change or a turn.  See 425 F.3d at 877.

[36] The Burton court held that it was "not apparent from the language" of the signaling statute "whether a signal is required when two lanes blend into one[,]" and the court therefore found the statute unconstitutionally vague as applied to the driver's conduct.  240 P.3d at 936.  Burton suggests, then, that if this court determined that the words "move right or left" in Section I of RSA 265:45 are ambiguous as applied to the driver's actions in this case and thus could arguably require a signal (which it does not), such a construction may render the statute unconstitutionally vague.  Because courts must construe statutes in a way that avoids placing their constitutionality in doubt, adopting that construction would be erroneous.  See Zadvydas v. Davis, 533 U.S. 678, 689 (2001) ("[I]t is a cardinal principle of statutory interpretation . . . that when an Act of Congress raises 'a serious doubt' as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided" (quotations omitted)).

v. Dewbre, 991 P.2d 388, 390-91 (Idaho Ct. App. 1999) (statutorily distinguishable because statute expressly required signal when moving right or left upon a highway); Commonwealth v. Olsen, No. CR-1700379, 2018 WL 9515245, at *1 (Va. Cir. Jan. 31, 2018) (factually distinguishable because the driver merged onto the highway and statutorily distinguishable because the statute at issue (unlike New Hampshire's) unambiguously and expressly requires signaling when "partly turn[ing] from a direct line").

The court therefore concludes that Officer Kapteyn's mistaken interpretation of RSA 265:45 as requiring a signal under these circumstances was not objectively reasonable. Thus, the ensuing traffic stop was unlawful.

## IV.   **Conclusion**

As alluded to supra Part III, the court has conducted a near-exhaustive examination of New Hampshire's signaling statute. The depth of analysis of what appears to be an uncomplicated traffic law may be viewed by some as a triumph of legalism over common sense, or an elevation of form over substance. What followed the traffic stop, however, was a seizure of the defendant's person, and the reasonableness and constitutional permissibility of that seizure depends completely on the lawfulness of the traffic stop. Accordingly, the close parsing of RSA 265:45 is not only warranted here, but necessary in order to resolve the constitutional issue. While evidently conducted in good faith, the stop was not supported by the statute nor by a reasonable mistake about its meaning.

For the reasons set forth above, Potter's motion to suppress[37] is GRANTED.

---

[37] Doc. no. 14.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  July 8, 2022

cc:     Joachim H. Barth, AUSA
        Alexander S. Chen, Esq.
        Eric Wolpin, Esq.